## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **PUBLIC INTEREST LEGAL FOUNDATION, INC.** | |
| *Plaintiff*, | |
| *v.* | Case No. _____ |
| **STEVE SIMON,** in his official capacity as the Secretary of State for the State of Minnesota, | |
| *Defendant*. | |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff Public Interest Legal Foundation, Inc. ("Foundation") brings this action for declaratory and injunctive relief for Defendant's violations of Section 8(i)(1) of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i)(1) ("Public Disclosure Provision").

## SUMMARY OF THE ACTION

1.      Minnesota's statutory exemption from the NVRA, 52 U.S.C. § 20503(b), is invalid with respect to the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1) under the authority of *Shelby Cty. v. Holder*, 570 U.S. 529 (2013), *City of Boerne v. Flores*, 521 U.S. 507 (1997), and the principles articulated therein. The Foundation seeks relief from Defendant's NVRA violations, as alleged herein.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States. This Court also has jurisdiction under 52 U.S.C. § 20510(b), because the action seeks injunctive and declaratory relief under the NVRA. This Court may also grant declaratory relief under 28 U.S.C. § 2201.

3.     Because Minnesota's statutory exemption from the NVRA, 52 U.S.C. § 20503(b), is invalid as applied to the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1), the Court may exercise jurisdiction over the Defendant.

4.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(1), because the Defendant resides in this district, and under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

5.     The Foundation is a non-partisan, 501(c)(3) public interest organization incorporated and based in Alexandria, Virginia. The Foundation promotes the integrity of the electoral process nationwide through research, education, remedial programs, and litigation. The Foundation regularly utilizes the NVRA's Public Disclosure Provision and state and federal open records laws that require public disclosure of government records. Using records and data compiled through these open records laws, the Foundation analyzes the programs and activities of state and local election officials to determine whether lawful efforts are being made to keep voter rolls current and accurate as required by federal and state law, and to determine whether eligible registrants have been

2

improperly removed from voter rolls. The Foundation also uses public records and data to produce and disseminate reports, articles, blog and social media posts, and newsletters to advance the public education aspect of its organizational mission.

6.      Defendant Steve Simon is the is Secretary of State for the State of Minnesota, and is Minnesota's "chief election official," *Carson v. Simon*, No. 20-CV-2030-NEB-TNL, 2020 U.S. Dist. LEXIS 191445, at *10 (D. Minn. Oct. 11, 2020); *see also* Office of the Minn. Sec'y of State Steve Simon, *About the Office*, https://www.sos.state.mn.us/about-the-office/about-the-office/about-steve-simon/ (describing Secretary Simon as "chief elections administrator").

7.      Secretary Simon is sued only in his official capacity.

## BACKGROUND

### The NVRA's Public Disclosure Provision

8.      "For many years, Congress left it up to the States to maintain accurate lists of those eligible to vote in federal elections, but in 1993, with the enactment of the National Voter Registration Act (NVRA), Congress intervened." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018).

9.      The NVRA is "a complex superstructure of federal regulation atop state voter-registration systems." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 5 (2013).

10.     The multi-layered system in which the NVRA operates is permitted by the Constitution's Elections Clause. U.S. Const. Art. I, § 4, cl. 1. *See also Inter Tribal*, 570 U.S. at 8-9; *ACORN v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) ("Consistent with this

point, the 'Manner' of holding elections has been held to embrace the system for registering voters.").

11.     When Congress passed the NVRA, it found,

(1)  the right of citizens of the United States to vote is a fundamental right;

(2)  it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3)  discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

52 U.S.C. § 20501(a).

12.     Congress enacted the NVRA for the following purposes:

(1)  to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2)  to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3)  to protect the integrity of the electoral process; and

(4)  to ensure that accurate and current voter registration rolls are maintained.

52  U.S.C. § 20501(b).

13.     The NVRA imposes various requirements on the States with respect to voter registration, including the requirement that state driver's license applications serve as applications for voter registration, 52 U.S.C. § 20504(a)(1), and the requirement that each state use reasonable efforts to remove the names of registrants who are ineligible due to death or a change in residency, 52 U.S.C. § 20507(a)(4)(A)-(B).

4

14.     The NVRA also requires the States to allow public inspection and reproduction of voter list maintenance records. The NVRA's Public Disclosure Provision provides, "Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1).

15.     The only records exempted from the NVRA's Public Disclosure Provision are records that "relate to a declination to register to vote or the identity of the voter registration agency through which any particular voter registered." 52 U.S.C. § 20507(i)(1).

16.     The NVRA's Public Disclosure Provision reflects Congress's findings and furthers the NVRA's purposes by making transparent government decisions about who can and cannot vote. In short, the NVRA's Public Disclosure Provision exists so the Public can evaluate the adequacy and lawfulness of officials' voter list maintenance actions.

17.     In the words of the Fourth Circuit, the NVRA's Public Disclosure Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334-35 (4th Cir. 2012).

18.     In the words of the First Circuit, the Public Disclosure Provision "evinces Congress's belief that public inspection, and thus public release, of Voter File data is necessary to accomplish the objectives behind the NVRA." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 54 (1st Cir. 2024).

19.     Various United States District Courts accord. *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *12 (S.D. Fla., Mar. 30, 2018) (citing 52 U.S.C. § 20507(i)) ("To ensure that election officials are fulfilling their list maintenance duties, the NVRA contains public inspection provisions."); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 721 (S.D. Miss 2014) ("The Public Disclosure Provision thus helps 'to ensure that accurate and current voter registration rolls are maintained.'") (citations and quotations omitted).

***The NVRA's Statutory Exemption for States with Election Day Registration Thirty Years Ago***

20.     NVRA Section 4(b) provides that the NVRA does not apply to states that, on August 1, 1994, did not have a voter registration requirement, or allowed all voters to register at the polling place on Election Day ("Election Day Registration"). 52 U.S.C. § 20503(b)(1)-(2) (hereafter, the "NVRA Exemption").

21.     Minnesota has offered Election Day Registration continuously since at least August 1, 1994, and Minnesota is therefore supposedly exempt from the NVRA under to 52 U.S.C. § 20503(b)(2).

22.     Due to the NVRA Exemption, Minnesota is not required to maintain all voter list maintenance records for at least two years. 52 U.S.C. § 20507(i)(1).

6

23.     Due to the NVRA Exemption, Minnesota is not required to make all voter list maintenance records public. 52 U.S.C. § 20507(i)(1).

24.     Due to the NVRA Exemption, Minnesota is not required to limit records-production costs to "photocopying at a reasonable cost." 52 U.S.C. § 20507(i)(1).

25.     Five additional states—Idaho, Wisconsin, New Hampshire, North Dakota, and Wyoming—are also exempt from the NVRA. *See* U.S. Department of Justice, The National Voter Registration Act of 1993 (NVRA), https://www.justice.gov/crt/national-voter-registration-act-1993-nvra ("What States are covered by the NVRA's requirements?").

***Minnesota Requires Voter Registration***

26.     Minnesota currently requires voter registration. Minn. Stat. § 201.018, Subd. 2; *see also* Minn. Stat. § 201.014, Subd. 1 (describing eligibility requirements); Minn. Stat. § 201.071, Subd. 1 (describing requirements for voter registration application).

27.     If an individual's United States citizenship is verified, registration is automatic upon submission of a driver's license application, MinnesotaCare application, medical assistance application, or an application for other state benefits or services. Minn. Stat. § 201.161, Subd. 1(a).

28.     In addition to Election Day Registration at polling places, Minn. Stat. § 201.061, Subd. 3, Minnesota offers voter registration in person, by mail, and through the Internet by electronic application. *See* Minn. Stat. § 201.061, Subd. 1(a)(1); 1(a)(2). Minnesota also allows registrants eligible to vote by absentee ballot to register to vote by

including a completed application with the absentee ballot. Minn. Stat. § 203B.04, Subd. 4.

29.     Despite the NVRA Exemption, Minnesota has also decided to "accept voter registration applications on forms prescribed by the Federal Election Commission as provided by the National Voter Registration Act" if the form contains certain information. Minn. R. 8200.3900.

***Minnesota Law Requires Voter List Maintenance Programs and Activities***

30.     Minnesota law currently requires performance of voter list maintenance programs and activities.

31.     Minn. Stat. § 201.091, Subd. 2 contains a general voter list maintenance mandate: "The records in the statewide registration system must be periodically corrected and updated by the county auditor."

32.     Certain voter list maintenance procedures begin shortly after registration. Minnesota county auditors must

> mail a notice indicating the individual's name, address, precinct and polling place to each registered voter. The notice shall indicate that it must be returned if it is not deliverable to the voter at the named address. Upon return of the notice by the postal service, the county auditor shall change the registrant's status to "challenged" in the statewide registration system. An individual challenged in accordance with this subdivision shall comply with the provisions of section 204C.12, before being allowed to vote.

Minn. Stat. § 201.121, Subd. 2.

33.     Minn. Stat. § 201.12, Subd. 1 allows county auditors to send a similar mailing to "any registered voter": "To prevent fraudulent voting and to eliminate excess names, the county auditor may mail to any registered voter a notice stating the voter's

name and address as they appear in the registration files. The notice shall request the

voter to notify the county auditor if there is any mistake in the information."

34.     Minnesota law further provides for procedures to update voter registration

records of registrants who move within the state, Minn. Stat. § 201.12, Subd. 2, and to

inactivate registration records of registrants who move out of the state, Minn. Stat. §

201.12, Subd. 3.

35.     Secretary Simon must use change-of-address information provided by the

United States Postal Service to perform voter list maintenance, Minn. Stat. § 201.13,

Subd. 3, and may rely on driver's license data provided by the Minnesota Department of

Public Safety, *id*.

36.     Minnesota reported mailing 115,653 address confirmation notices to

registrants between January 1, 2021 and December 31, 2022. Election Assistance

Commission, Election Administration and Voting Survey 2022 Comprehensive Report at

182, *available at*  https://www.eac.gov/sites/default/files/2023-

06/2022_EAVS_Report_508c.pdf (last accessed April 29, 2024) ("2022 EAVS"). One

hundred percent (100%) of these confirmations were reportedly not returned by the

recipient. *Id*. at 184.

37.     Minnesota officials also rely on voting history to perform voter list

maintenance.

> Within six weeks after every election, the county auditor shall post the voting
> history for every person who voted in the election. After the close of the
> calendar year, the secretary of state shall determine if any registrants have
> not voted during the preceding four years. The secretary of state shall
> perform list maintenance by changing the status of those registrants to
> "inactive" in the statewide registration system.

Minn. Stat. § 201.171.

38.     Secretary Simon "shall also prepare a report to the county auditor containing the names of all registrants whose status was changed to 'inactive.'" *Id*.

39.     "Registrants whose status was changed to 'inactive' must register in the manner specified in section 201.054 before voting in any primary, special primary, general, school district, or special election, as required by section 201.018." *Id*.

40.     Secretary Simon and county auditors are required by law to change to "deceased" registration records belonging to deceased registrants. *See* Minn. Stat. § 201.13, Subds. 1, 1a, and 2.

41.     Individuals convicted of treason or any felony are ineligible to register to vote unless their civil rights have been restored. Minn. Stat. § 201.014, Subd. 2(a).

42.     Secretary Simon must create a list of registrants who are incarcerated for felony sentences, and "the county auditor must challenge the status on the record in the statewide voter registration system of each individual named in the list." Minn. Stat. § 201.145, Subd. 3(c). When any such individual is released from incarceration, "the county auditor must remove the challenge status on the record in the statewide voter registration system of each individual named in the list." Minn. Stat. § 201.145, Subd. 4(d).

43.     Only United States citizens may vote in Minnesota elections. Minn. Stat. § 201.014, Subd. 1(2).

44.     Secretary Simon must create a list of registrants who have temporary lawful status in the United States, and "the county auditor must challenge the status on the record in the statewide voter registration system of each individual named in the list." Minn. Stat. § 201.145, Subd. 5(c).

45.     Individuals adjudged legally incompetent and individuals under a guardianship in which the court order revokes the ward's right to vote are ineligible to vote. Minn. Stat. § 201.014, Subd. 2(2)-(3).

46.     Secretary Simon must create a list of registrants who meet a condition described in the preceding paragraph, and "the county auditor must challenge the status on the record in the statewide voter registration system of each individual named in the list." Minn. Stat. § 201.145, Subd. 2(d).

47.     Minnesota law requires the county auditor to inactivate a registrant's registration record "[i]f a voter makes a written request for removal of the voter's record." Minn. Stat. § 201.13, Subd. 4.

48.     Minnesota law also requires mandatory activities to address duplicated registration records. Minn. Stat. § 201.171 provides, "List maintenance must include procedures for eliminating duplicate names from the official list of eligible voters."

49.     Minnesota law permits any registered voter to challenge the eligibility or residence of any other registered voter within the same county. Minn. Stat. § 201.195, Subd. 1(a).

50.     Minnesota officials also rely on official name-change records to perform voter list maintenance. Minn. Stat. § 201.14.

11

51.     In short, Minnesota law provides for numerous official processes through which a registered voter can gain and lose her eligibility to vote.

52.     In Minnesota, records concerning the activities described in the preceding paragraphs are not subject to disclosure under the NVRA's Public Disclosure Provision.

53.     Between January 1, 2021 and December 31, 2022, Minnesota removed 322,355 registrants (8.9 percent of registered voters) for various reasons. *See supra* 2022 EAVS at 188.

54.     Minnesota is also part of an interstate compact called the Electronic Registration Information Center ("ERIC"),[1] which exists "to assist states in improving the accuracy of America's voter rolls and increasing access to voter registration for all eligible citizens."[2] Minn. Stat. § 201.13, Subd. 3(d) (providing requirements for any "agreement to share information or data with an organization governed exclusively by a group of states").

55.     ERIC provides Minnesota with "list maintenance" reports that identify registrants who may be ineligible due to their death, relocation to another jurisdiction or state, or registration record duplication.[3]

56.     The accuracy of ERIC's work has been criticized. Barbara Arnwine, the former executive director of the Lawyers' Committee for Civil Rights Under Law, stated,

---

[1] ERIC, "Which States are Members of ERIC?", https://ericstates.org/about/ (last accessed April 29, 2024).
[2] ERIC FAQs, "What is ERIC?" https://ericstates.org/faq/ (last accessed April 29, 2024).
[3] *See* ERIC, "Accurate Voter Rolls," https://ericstates.org/statistics/ (last accessed April 29, 2024).

"ERIC should be called ERROR because it's that erroneous and that full of flaws." Greg

Palast, *ERIC Crow, Jim Crow's liberal twin* (July 15, 2020),

https://www.nationofchange.org/2020/07/15/eric-crow-jim-crows-liberal-twin/ (last

accessed April 29, 2024).

57.    The Brennan Center for Justice reported the following in a 2019 report:

Wisconsin … reported that although ERIC was helpful in updating more than 25,000 registration addresses in 2017 and 2018, it also resulted in more than 1,300 voters signing 'supplemental poll lists' at a spring 2018 election, indicating that they had not in fact moved and were wrongly flagged.

Brater et al., Purges: A Growing Threat to the Right to Vote at 9 (2019),

https://www.brennancenter.org/sites/default/files/2019-

08/Report_Purges_Growing_Threat.pdf (last accessed April 29, 2024).

58.    Marc Meredith, an associate professor in the Department of Political

Science at the University of Pennsylvania, stated,

While ERIC is usually correct, sometimes they're wrong, and it turns out they're more likely to be wrong in the case where the registrant is a racial or ethnic minority as opposed to a white registrant[.]

Kristen de Groot, Penn Today, The racial burden of cleaning voter rolls (Feb. 24, 2021),

https://penntoday.upenn.edu/news/racial-burden-cleaning-voter-rolls (last accessed April

29, 2024).

59.    A Yale University-led study of ERIC in Minnesota's neighbor, Wisconsin,

found that at least 4% of people listed as suspected 'movers' cast ballots in 2018 elections using addresses that were wrongly flagged as out of date. Minority voters were twice as likely as white voters to cast their ballot with their original address of registration after the state marked them as having moved, the study showed.

Yale University, Study uncovers flaws in process for maintaining state voter rolls (Feb. 26, 2021), https://phys.org/news/2021-02-uncovers-flaws-state-voter.html (last accessed April 29, 2024).

60.     The Yale study's lead author, political scientist Gregory A. Huber, stated,

> **The process of maintaining states' voter-registration files cries out for greater transparency[.]** … Our work shows that significant numbers of people are at risk of being disenfranchised, particularly those from minority groups. Unfortunately, we don't know enough about the process used to prune voter rolls nationwide to understand why mistakes occur and how to prevent them.

*Id.* (emphasis added).

61.     ERIC periodically issues reports correcting inaccurate information contained in prior reports. Prior reports are occasionally corrected because they erroneously identified living registrants as deceased.

***Minnesota's NVRA Exemption Is Invalid with Respect to the NVRA's Public Disclosure Provision***

The Voting Rights Act, *Shelby County* and Equal State Sovereignty

62.     In 1965, Congress passed the Voting Rights Act ("VRA") in 1965, 52 U.S.C. § 10101 *et seq.*, to combat racial discrimination in voting.

63.     Section 5 of the VRA required States to obtain federal permission before enacting any law related to voting, and Section 4 of the VRA applied that requirement only to some States, those that had used a forbidden test or device in November 1964, and had less than 50% voter registration or turnout in the 1964 Presidential election, 52 U.S.C. § 10303(b).

64. In 1966, the Supreme Court upheld Section 4 against a constitutional challenge, explaining that "exceptional conditions can justify legislative measures not otherwise appropriate." *South Carolina v. Katzenbach*, 383 U.S. 301, 334 (1966).

65. VRA Section 4's coverage formula was not static. The VRA contained a provision allowing covered states to "bailout" of Section 5's federal preclearance requirement by seeking a declaratory judgment from a three-judge panel in United States District Court for the District of Columbia. *See* 52 U.S.C. § 10303(a)(1).

66. The VRA also contained a provision under which states could be "bailed in" to the federal preclearance requirement for committing violations of the Fourteenth or Fifteenth Amendments. 52 U.S.C. § 10302(c).

67. In 2009, the Supreme Court of the United States considered an action brought by a Texas municipal utility district seeking relief from Section 5's federal preclearance requirement under the VRA's "bailout" provision. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009) ("*NWAMUDNO*"). Alternatively, the municipal utility district challenged the constitutionality of VRA Section 5. *Id*. at 196.

68. The Supreme Court observed that the VRA "differentiates between the States, despite our historic tradition that all the States enjoy 'equal sovereignty.'" *NWAMUDNO*, 557 U.S. at 203 (citing *United States v. Louisiana*, 363 U.S. 1, 16 (1960)).

69. While "[d]istinctions can be justified in some cases," the Supreme Court acknowledged, "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Id*. at 203.

15

70.     The Court explained that while the conditions that justified the VRA had "improved," "[p]ast success alone, however, is not adequate justification to retain the preclearance requirements." *Id*. at 202. "[T]he Act imposes current burdens and must be justified by current needs." *Id*. at 203. Ultimately, the Supreme Court held that the utility district was eligible to seek a "bail out" under the VRA and declined to resolve the VRA's constitutionality.

71.     In *Shelby Cty. v. Holder*, 570 U.S. 529 (2013), the Supreme Court held that VRA Section 4 is unconstitutional. In doing so, the Court reaffirmed "the principle that all States enjoy equal sovereignty[.]" *Id*. at 535; *see also id*. at 544 ("[T]he constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized.") (citations and quotations omitted).

72.     With respect to a law that treats the states differently, "a statute's 'current burdens' must be justified by 'current needs,' and any 'disparate geographic coverage' must be 'sufficiently related to the problem that it targets.'" *Id*. at 550-51.

73.     Further, "Congress—if it is to divide the States—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions. It cannot rely simply on the past." *Id*. at 553.

74.     Unlike the VRA, the NVRA is static. It contains no "bail in" or "bailout" provision.

75.     The NVRA Exemption departs from the principle of equal state sovereignty because it treats six states—including Minnesota—differently than other states.

16

76.     Minnesota's exemption from the NVRA's Public Records Provision did not "make sense" in 1994 and it certainly does not "make sense in light of current conditions." *See Shelby Cty.*, 570 U.S. at 553.

77.     Minnesota, like 48 other states, currently requires voter registration.

78.     Minnesota law currently requires motor vehicle departments to facilitate voter registration, Minn. Stat. § 201.161, Subd. 1(a)(1), similar to the NVRA's requirement, 52 U.S.C. § 20504(a)(1); *see also* https://www.eac.gov/sites/default/files/2023-10/2022_EAVS_Data_Brief_MN_508c.pdf (reporting that 27.4% of voter registration applications are processed at motor vehicle departments).

79.     Minnesota also currently conducts a robust and multi-faceted voter list maintenance program, which is designed to grant, preserve, and remove voting rights.

80.     Under current conditions, Congress's findings (52 U.S.C. § 20501(a)) and the NVRA's purposes (52 U.S.C. § 20501(b)) are equally relevant in Minnesota.

81.     Under current conditions, the "problems" that the NVRA "targets" are equally prevalent in Minnesota.

82.     Because the NVRA's Public Disclosure Provisions exists to further the NVRA's purposes and aid in its enforcement, the Public Disclosure Provision is equally relevant in Minnesota.

83.     Minnesota's offering Election Day Registration has not relieved Minnesota of the need—or desire—to do the very same things Congress designed the NVRA to do:

protect the fundamental right to vote, remove unfair registration laws, protect the integrity of the electoral process, and maintain accurate voter rolls. *See supra* ¶¶ 11-12.

84.     In fact, Minnesota has enacted specific voter list maintenance procedures to address Election Day Registration. *See* Minn. Stat. § 201.121, Subd. 3.

85.     Furthermore, nineteen (19) other states and the District of Columbia have implemented Election Day Registration. *See* https://www.ncsl.org/elections-and-campaigns/same-day-voter-registration (last accessed April 29, 2024). Thirteen states of those nineteen states and the District of Columbia are subject to the NVRA's Public Disclosure Provision, while Minnesota, and five other states are not.

86.     The NVRA's "disparate geographic coverage" is thus not "sufficiently related to the problem that it targets," and does not "make[] sense in light of current conditions." *Shelby Cty.*, 570 U.S. at 551, 553.

87.     Minnesota's exemption from the NVRA's Public Disclosure Provision violates the principle of equal state sovereignty, and it is therefore invalid.

88.     Maine's experience further exemplifies the irrationality of the exemption from the NVRA's Public Disclosure Provision. Maine initially qualified for the NVRA Exemption because it had implemented Election Day Registration on August 1, 1994. Maine lost its exemption when it repealed its Election Day Registration law in 2011. *See* LD 1376 (HP 1015) (2011). Although EDR was subsequently restored through the

referendum process, *see* Maine Same-Day Registration Veto Referendum, Question 1 (2011)[4], Maine's NVRA Exemption was not restored.

<u>*City of Boerne* and the Requirement of Congruence and Proportionality</u>

89.     The NVRA is an exercise of Congress's constitutional authority to enforce the Fourteenth and Fifteenth Amendments. U.S. Const. Amend. 14, Sec. 5; U.S. Const. Amend. 15, Sec. 2; *see also Condon v. Reno*, 913 F. Supp. 946, 962 (D.S.C. 1995) ("The legislative history and the text of the NVRA are clear that Congress was utilizing its power to enforce the equal protection guarantees of the Fourteenth Amendment."); *see also id.* at 967 ("Congress had a sound basis on which to conclude that a federal voter registration law was an appropriate means of furthering the protections of the Fourteenth and Fifteenth Amendments.").

90.     In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that when Congress enforces the Fourteenth Amendment through legislation, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id*. at 520.

91.     The NVRA's legislative history indicates that with the NVRA, Congress intended to "reduce … obstacles to voting to the absolute minimum while maintaining the integrity of the electoral process." H. Rep. No. 9, 103rd Cong., St. Sess. 3, reprinted in 1993 U.S. Code, Cong. & Admin. News, 105, 106-07.

---

[4] https://ballotpedia.org/Maine_Same-Day_Registration_Veto_Referendum,_Question_1_(2011)#cite_note-ballot-1 (last accessed April 29, 2024).

92.     The NVRA's findings and purposes reflect this goal. *See* 52 U.S.C. § 20501(a)-(b).

93.     The NVRA's goal of maintaining accurate and current voter registration rolls, 52 U.S.C. § 20501(b)(4), is both an end unto itself, and a means to achieve Congress's other purposes, including eliminating "discriminatory and unfair registration laws," 52 U.S.C. § 20501(a)(3), "increas[ing] the number of eligible citizens who register to vote," 52 U.S.C. § 20501(b)(1), and, "protect[ing] the integrity of the electoral process," 52 U.S.C. § 20501(b)(3).

94.     The NVRA's Public Disclosure Provision helps achieve Congress's objectives by allowing the public to monitor the government's activities with respect to voter list maintenance and the electoral process, and where necessary, enforce the NVRA's mandates through the NVRA's private right of action, 52 U.S.C. § 20510(b).

95.     The NVRA Exemption lacks the required "congruence and proportionality" because it exempts states like Minnesota, where the injuries Congress sought to remedy are equally prevalent and Congress's transparency and oversight objectives are equally relevant.

96.     Minnesota's exemption from the NVRA's Public Disclosure Provision violates the principle of congruence and proportionality, and it is therefore invalid.

***Minnesota Law Concerning Requests for the Official Registration List***

97.     Minnesota law requires each county auditor to "make available for inspection a public information list which must contain the name, address, year of birth, and voting history of each registered voter in the county." Minn. Stat. § 201.091, Subd. 4.

20

98.     "The county auditors and the secretary of state shall provide copies of the public information lists in electronic or other media to any voter registered in Minnesota within ten days of receiving a written or electronic request accompanied by payment of the cost of reproduction." Minn. Stat. § 201.091, Subd. 5.

99.     As Minn. Stat. § 201.091, Subd. 5 indicates, public information lists are available only to Minnesota registered voters ("Registered Voter Requirement"). *See also* https://www.sos.state.mn.us/election-administration-campaigns/data-maps/registered-voter-list-requests/ ("Note: This information is only available to registered Minnesota voters, and may only be used for purposes related to elections, political activities, or law enforcement.") (last accessed April 29, 2024).

100.    Minnesota registered voters may request public information lists using the "Registered Voter List Request" form made available on Secretary Simon's website. *See* https://www.sos.state.mn.us/media/2641/registered-voter-list-request-form.pdf (last accessed April 29, 2024).

101.    The Registered Voter List Request form requires the requestor to attest to the following statement: "I certify that I am a registered voter in the State of Minnesota and that the information in this list of registered voters will be used only for purposes related to elections, political activities, or law enforcement (M.S. 201.091)." *Id.*

***The Statewide Public Information List Is Subject to Disclosure Under the NVRA's Public Disclosure Provision***

102.    Courts universally agree that a state's voter roll is subject to disclosure under the NVRA's Public Disclosure Provision. *See Pub. Int. Legal Found., Inc. v.*

*Bellows*, 92 F.4th at 49 (*quoting* 52 U.S.C. § 20507(i)(1) ("Maine's Voter File is a 'record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' and is thus subject to disclosure under Section 8(i)(1).") *Pub. Interest Legal Found. v. Matthews*, 589 F. Supp. 3d 932, 943-44 (C.D. Ill. 2022) ("Defendants acted in violation of the Public Disclosure Provision of the NVRA when Defendants refused to make available for viewing and photocopying the full statewide voter registration list."); *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 438-442, 446 (D. Md. 2019) (holding, under the NVRA, that plaintiff "is entitled to the voter registration list for [a] County that includes fields indicating name, home address, most recent voter activity, and active or inactive status"); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 723 (S.D. Miss. 2014) ("[T]he Voter Roll is a 'record' and is the 'official list[] of eligible voters' under the NVRA Public Disclosure Provision."); *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *13 (S.D. Fla. Mar. 30, 2018) ("[E]lection officials must provide full public access to all records related to their list maintenance activities, including their voter rolls."); *Voter Reference Found., LLC v. Torrez*, No. CIV 22-0222 JB/KK, 2024 U.S. Dist. LEXIS 58803, at *436 (D.N.M. Mar. 29, 2024) (quoting 52 U.S.C. § 20507(i)(1)) ("As is discussed above, the Court, concurring with all other federal courts that have considered this issue, concludes that a current list of a State's registered voters -- the core voter roll -- is a 'record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'"); *see also Ill. Conservative Union v. Illinois*, No. 20 C

22

5542, 2021 U.S. Dist. LEXIS 102543, at *15 (N.D. Ill. June 1, 2021) (holding, at the

pleading stage, that statewide voter roll "falls within Section 8(i)'s disclosure provision").

103.    Minnesota's Statewide Public Information List is likewise subject to

disclosure under the NVRA's Public Disclosure Provision, because, *inter alia*, it reflects

and is the end product of Minnesota's voter list maintenance activities. *See Pub. Int.*

*Legal Found., Inc. v. Bellows*, 92 F.4th at 47 ("The Voter File can thus be characterized

as the output and end result of such activities. In this way, the Voter File plainly relates to

the carrying out of Maine's voter list registration and maintenance activities and is

thereby subject to disclosure under Section 8(i)(1).").

### *The NVRA Does Not Permit States to Limit Disclosure to Registered Voters or Residents of a State*

104.    The NVRA compels disclosure of "all records" concerning voter list

maintenance, with just two narrow exceptions. 52 U.S.C. § 20507(i)(1) (exception only

"records relate[d] to a declination to register to vote or to the identity of a voter

registration agency through which any particular voter is registered").

105.    The NVRA does not authorize states to restrict disclosure beyond the two

exceptions the NVRA identifies.

106.    Any state law limiting disclosure is preempted because the NVRA, as a

federal enactment, is superior to conflicting state laws under the Constitution's Elections

and Supremacy Clauses. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12-

15 (2013).

107.     In *Judicial Watch, Inc. v. Lamone*, the United States District Court for the District of Maryland applied this preemption to Maryland's registered voter requirement, holding that Maryland "law is preempted in so far as it allows only Maryland registered voters to access voter registration lists." 399 F. Supp. 3d at 445.

***The Foundation Requested Records Pursuant to the Public Disclosure Provision***

108.     On January 24, 2024, pursuant to the NVRA's Public Disclosure Provision, the Foundation made the following requests from Secretary Simon's office:

1.  A current or most updated copy of the complete Minnesota Registered Voter List containing all data fields as described in Minnesota Statutes § 201.091(4) ("Statewide Public Information List").

2.  "Deceased Reports" received from ERIC during the years 2020, 2021, 2022, and 2023 ("ERIC Reports").

Exhibit A at 1-2 (hereafter, the "Request").

109.     The Foundation included "partially completed Registered Voter List Request" to clarify the Foundation's request. Exhibit A at 1-2.

110.     The Foundation's Request explained, "As a nonprofit law firm headquartered in Virginia, the Foundation (and its employees) cannot certify on the request form to being a registered voter in Minnesota." Exhibit A at 2.

111.     The Foundation mailed a check for $46 to Secretary Simon's office to cover the cost of the request. *See* Exhibit A at 2.

112.     The Foundation's Request explained further, "Notwithstanding 52 U.S.C. § 20503(b), the Foundation believes Minnesota is not exempt from the NVRA's public records provision, 52 U.S.C. § 20507(i)(1)."

***Defendant Is Refusing to Make the Statewide Public Information List Available to the
Foundation***

113.    On February 21, 2024, Secretary Simon's office responded to the

Foundation's Request through Justin R. Erickson, who asked the Foundation to provide

"more context" or "authority" concerning the Foundation's belief that Minnesota is not

exempt from the NVRA's Public Disclosure Provision. Exhibit B (hereafter, "SOS

Response").

114.    On February 22, 2024, the Foundation sent a letter to Secretary Simon's

office, providing the requested context and authority. Exhibit C (hereafter, "Clarification

Letter").

115.    On March 1, 2024, Secretary Simon's office responded to the Foundation

through Mr. Erickson, who stated, "[W]e have reviewed the authority that you provided

and have concluded this act does not apply to the State of Minnesota. *See* 52 U.S.C. §

20503(b). We therefore have construed your request to be made pursuant to the

Minnesota Government Data Practices Act, Minn. Stat. Ch. 13." Exhibit D (hereafter,

"Denial").

116.    Secretary Simon's Denial denied the Foundation's request for the Statewide

Public Information List because the Foundation is not a Minnesota registered voter.

117.    The Denial states, "[T]he Foundation is an entity and not a registered voter

in Minnesota. Because Minnesota Statutes section 201.091, subdivision 5 allows only

registered voters in Minnesota to access this list, no data is being produced in response to

this request. We will refund your fee that you previously provided." Exhibit D.

118.   On March 5, 2024, the Foundation notified Secretary Simon that he is in violation of the NVRA for failure to permit inspection and reproduction of voter list maintenance records as required by 52 U.S.C. § 20507(i)(1). Exhibit E (hereafter, "Notice Letter").

119.   The Notice Letter notified Secretary Simon that Minnesota's statutory exemption from the NVRA's Public Disclosure Provision is no longer valid. *See* Exhibit E at 2-3.

120.   The Notice Letter notified Secretary Simon that Minnesota's Statewide Public Information List is a record subject to disclosure under the NVRA. Exhibit E at 3.

121.   The Notice Letter also notified Secretary Simon that the NVRA preempts conflicting Minnesota laws, and specifically that the NVRA preempts Minnesota's Registered Voter Requirement. Exhibit E at 4.

122.   The Notice Letter also notified Secretary Simon that litigation may commence against him if the violations about which she was notified were not cured. Exhibit E at 4.

123.   The Notice Letter also explained how Secretary Simon could cure the violation described in the Notice Letter. Exhibit E at 4.

124.   By sending the Notice Letter to Secretary Simon, Minnesota's chief election official, the Foundation complied with the NVRA's pre-litigation notice requirements. *See* 52 U.S.C. § 20510(b)(1)-(2).

***Defendant Has Not Cured the NVRA Violation***

125.    The NVRA ordinarily provides a curative period for offending parties. 52 U.S.C. § 20510(b). "The apparent purpose of the notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." *Ga. State Conference of the NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012).

126.    In this case, there is no curative period because the violation occurred within 30 days of Minnesota's March 5, 2024, Presidential Primary, an election for federal office.[5] *See* 52 U.S.C. § 20510(b)(2).

127.    The Foundation nevertheless provided notice to Secretary Simon and "afford[ed] Secretary Simon 20 days, or until March 25, 2024, to cure the violation." Exhibit E at 4.

128.    The Foundation sent the Notice Letter, and Secretary Simon received it on March 5, 2024.

129.    Secretary Simon did not cure his violation by March 25, 2024, and has not cured his violation as of the day this action was filed.

130.    Therefore, this action is ripe.

***Defendant's Actions are Causing Concrete Harm to the Foundation***

131.    The requested records are records within the scope of the NVRA's Public Disclosure Provision.

---

[5] https://www.sos.state.mn.us/election-administration-campaigns/elections-calendar/ (last accessed April 29, 2024).

132.    The Public Disclosure Provision authorizes and entitles the Foundation to inspect and duplicate the requested records in electronic format.

133.    Defendant's violations of the NVRA are causing the Foundation to suffer a concrete informational injury because the Foundation does not have records and information to which it is entitled under federal law. *FEC v. Akins*, 524 U.S. 11, 21 (1998) ("[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute.").

134.    This "informational injury" is causing the Foundation to suffer additional adverse consequences.

135.    First, the Foundation cannot evaluate and scrutinize Minnesota's voter list maintenance activities.

136.    The Foundation gathers information about the state of the voter rolls across the nation to assess the accuracy and currency of the rolls and whether officials are complying with state and federal voter list maintenance standards, as well as other best practices.

137.    The Foundation will use the requested records to study, analyze, evaluate, and scrutinize Minnesota's voter list maintenance activities and Minnesota's compliance with state and federal law, and other best practices.

138.    The Foundation cannot do so because Secretary Simon refuses to produce the requested records.

139.    Second, Secretary Simon's actions are impairing the Foundation's educational programming.

140.    The Foundation uses public records and data to educate the public and election officials about numerous circumstances, including the state of their own voter rolls.

141.    The Foundation uses public records and data to educate members of Congress about numerous circumstances, including the effectiveness of federal laws such as the NVRA, HAVA, and the Voting Rights Act, possible amendments to these federal laws, and state officials' compliance with these federal laws.

142.    The Foundation uses records and data to produce and disseminate reports, articles, blog and social media posts, and newsletters to engage in education and public advocacy about pressing election-related matters.

143.    The Foundation's ability to perform these educational functions is impaired because Secretary Simon is refusing to produce the requested records.

144.    Third, Secretary Simon's actions are impairing the Foundation's institutional knowledge upon which it depends for its programming.

145.    The Foundation must continually keep its institutional knowledge current and accurate so that it can operate efficiently, timely, and effectively, including for the purposes that Congress intended under the NVRA, such as oversight, remedial programs, law enforcement, and education.

146.    The Foundation depends on accurate and current institutional knowledge to know where, when, and how to deploy its resources.

29

147.    The Foundation's institutional knowledge—and consequently its programming— is impaired because Secretary Simon refuses to produce the requested records.

148.    Fourth, Secretary Simon's actions are harming the Foundation by forcing it to re-prioritize its resources to the detriment of other programmatic priorities.

149.    The Foundation must expend additional resources and staff to counteract Secretary Simon's actions, which limits the Foundation's ability to fund some of its other programming, which includes research, analysis, remedial programming, and law enforcement.

150.    The Foundation intends to request similar records from Secretary Simon in the future.

151.    The Foundation will continue to be injured by NVRA violations unless and until the Defendant is enjoined from continuing to violate the law.

152.    The Foundation is a person aggrieved by a violation of the NVRA, as set forth in 52 U.S.C. § 20510(b)(1).

**COUNT I**
**Violation of Section 8(i) of the NVRA, 52 U.S.C. § 20507(i)**
**Denial of Access – Statewide Public Information List**

153.    The Foundation realleges the preceding paragraphs as if fully stated herein.

154.    Minnesota's NVRA Exemption is invalid with respect to the NVRA's Public Disclosure Provision.

155.     The record described in Minn. Stat. § 201.091, Subds. 4, 5—otherwise known as the Statewide Public Information List—is a record subject to disclosure under the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1).

156.     The Statewide Public Information List is in the Defendant's possession, custody, and control.

157.     The NVRA's Public Disclosure Provision requires Minnesota to produce the Statewide Public Information List to the Foundation.

158.     The Foundation requested an electronic copy of the Statewide Public Information List from the Defendant, but the Defendant has not produced it.

159.     Defendant is denying the Foundation's request for the Statewide Public Information List under Minnesota law, which limits disclosure of Public Information Lists to Minnesota registered voters, Minn. Stat. § 201.091, Subd. 5 ("Registered Voter Requirement").

160.     By denying the Foundation the ability to obtain records it otherwise could obtain under the NVRA's Public Disclosure Provision NVRA, Minn. Stat. § 201.091, Subd. 5 conflicts with federal law.

161.     Any Minnesota statute, regulation, practice, or policy that conflicts with, overrides, or burdens the NVRA, a federal statute, is preempted and superseded under the Supremacy Clause and the Elections Clause of the Constitution of the United States.

162.     Minnesota's Registered Voter Requirement—Minn. Stat. § 201.091, Subd. 5—invades a field occupied by Congress (i.e., voter list maintenance records), and poses obstacles to Congress's objectives under the NVRA.

163.    Minnesota's Registered Voter Requirement, Minn. Stat. § 201.091, Subd. 5,
and any other similar statute, regulation, rule, or policy, is therefore preempted, invalid,
and unenforceable.

164.    As described herein, Defendant's actions are causing concrete harm to the
Foundation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment:

1.    Declaring Minnesota's NVRA Exemption, 52 U.S.C. § 20503(b), invalid
with respect to the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1).

2.    Declaring that Defendant is in violation of NVRA Section 8(i) for refusing
to permit inspection and reproduction of the Statewide Public Information List.

3.    Declaring that NVRA Section 8(i) of the NVRA preempts and supersedes
Minnesota's Registered Voter Requirement, Minn. Stat. § 201.091, Subd. 5, and any
similar statute, regulation, rule, or policy that prevents the Foundation from inspecting
and reproducing the Statewide Public Information List.

4.    Ordering Defendant to produce the Statewide Public Information List to the
Foundation in electronic format.

5.    Permanently enjoining Defendant from denying the Foundation's requests
for the Statewide Public Information List, or other similar data, in the future.

6.    Ordering the Defendant to pay the Foundation's reasonable attorney's fees,
including litigation expenses and costs, pursuant to 52 U.S.C. § 20510(c); and,

7.    Granting the Foundation further relief that this Court deems just and proper.

Dated: April 30, 2024.

For the Plaintiff Public Interest Legal Foundation:

       */s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
Allie K. Howell (#504850)
UPPER MIDWEST LAW CENTER
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
James.Dickey@umlc.org
(612) 428-7000

Noel H. Johnson* (Wisconsin Bar #1068004)
Kaylan L. Phillips* (Indiana Bar #30405-84)
PUBLIC INTEREST LEGAL FOUNDATION, INC.
107 S. West Street, Suite 700
Alexandria, VA 22314
Tel. (703) 745-5870
njohnson@PublicInterestLegal.org
kphillips@PublicInterestLegal.org

*\* Motion for admission pro hac vice
forthcoming*

*Attorneys for Plaintiff Public Interest Legal
Foundation*