**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Public Interest Legal Foundation, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Steve Simon,<br><br>Defendant,<br><br>v.<br><br>United States of America,<br><br>Intervenor Defendant. | Case No. 24-cv-01561 (SRN/DJF)<br><br>**ORDER** |

Kaylan L. Phillips and Noel H. Johnson, Public Interest Legal Foundation, 320 S. West Street, Suite 700, Alexandria, VA 22314; and Alexandra Howell, Douglas P. Seaton, and James V.F. Dickey, Upper Midwest Law Center, 12600 Whitewater Drive, Minnetonka, MN 55343, for Plaintiff.

Erin Farmer and Linnea Constance VanPilsum-Bloom, Office of the Minnesota Attorney General, 445 Minnesota Street, Suite 1800, St. Paul, MN 55101, for Defendant.

Daniel J. Freeman and Richard Dellheim, United States Department of Justice, Civil Rights Division, 950 Pennsylvania Avenue Northwest, Washington, DC 20530, for Intervenor Defendant.

---

SUSAN RICHARD NELSON, United States District Judge.

Plaintiff Public Interest Legal Foundation (PILF) sued Defendant Steve Simon, Minnesota's Secretary of State, alleging that the Secretary violated the National Voter

Registration Act (NVRA), 52 U.S.C. §§ 20501–11. This matter is before the Court on the Secretary's Motion to Dismiss [Doc. 10]. Because the State of Minnesota is exempt from the NVRA, the Court grants the Secretary's motion.

## I. Background

PILF is a Virginia nonprofit that uses voter roll information for its work "promot[ing] the integrity of the electoral process nationwide through research, education, remedial programs, and litigation." (Doc. 1 ¶ 5.) In January 2024, PILF contacted the Secretary's office to request copies of Minnesota's registered voter list, along with all 2020 to 2023 "Deceased Reports" received from the Electronic Registration Information Center (ERIC), an interstate compact that helps states improve the accuracy of voter rolls. (*Id.* ¶¶ 54, 108.) Under Minnesota law, a registered voter may request a "public information list" with the name, address, birth year, and voting history of each voter if she will use it only "for purposes []related to elections, political activities, or law enforcement." Minn. Stat. § 201.091, Subds. 4 & 5. But PILF is not a registered Minnesota voter, so the Secretary denied its request. (Doc. 1 ¶ 116.)

PILF sued, alleging that Minnesota's refusal violates the NVRA, 52 U.S.C. § 20507(i)(1). (Doc. 1 at 1.) Congress enacted the NVRA to "increase the number of eligible citizens who register to vote in elections for Federal office," "enhance[] the participation of eligible citizens as voters in elections for Federal office," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." § 20501. Also known as the "Motor Voter Law," the NVRA "directs states to establish at least three methods of voter registration for federal elections: '(1) by

application made simultaneously with an application for a motor vehicle driver's license,' '(2) by mail application' using a federally prescribed form, and '(3) by application in person' at designated voter registration agencies." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) (quoting § 20503(a)). "It further requires that states conduct a general program to remove ineligible voters from official voter lists without engaging in improper voter removal." *Id.* (citing § 20507(a)(3)–(4)). And finally, it "mandates public disclosure of voter registration activities." *Id.* (citing § 20507(i)(1)). Covered states must "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i)(1).

But not all states are covered. Section 4(b)(1) exempts states that have not required voters to register since August 1, 1994. § 20503(b)(1). And Section 4(b)(2) exempts states that have provided election-day registration at the polls since that date. § 20503(b)(2).

As PILF admits, Minnesota is exempt under Section 4(b)(2). (Doc. 1 ¶ 21.) But PILF contends that Section 4(b) is unconstitutional because it violates the equal state sovereignty principle and is not congruent and proportional to the harm it seeks to remedy. (*Id.* ¶¶ 62–96.)

## II. Analysis

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The

Court assumes the truth of all factual allegations and makes all reasonable inferences in favor of the nonmoving party, but it is "not bound to accept the truth of legal conclusions couched as factual allegations." *Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1024 (8th Cir. 2022) (citing *Twombly*, 550 U.S. at 555). When the alleged facts do not establish standing to sue or the plaintiff has no "viable legal theory" to support its claims, the Court must dismiss the case. *See id.*; *Warth v. Seldin*, 422 U.S. 490, 501–02 (1975).

**A. Standing**

To start, the Court must determine whether it may hear this dispute. Under Article III, § 2 of the United States Constitution, a federal court may hear a dispute "only if it is a 'case' or 'controversy.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines*, 521 U.S. at 819). And to have standing, a plaintiff needs to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When reviewing a standing question, a court must "assume that on the merits the plaintiff[] would be successful in [its] claims." *Miller v. Thurston*, 967 F.3d 727, 734 (8th Cir. 2020) (quoting *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 968 (8th Cir. 2016)); *see also Warth*, 422 U.S. at 502.

Starting with injury in fact, a plaintiff suffers an informational injury if it "fail[s] to receive required information" that is "subject to public-disclosure or sunshine laws" and experiences "downstream consequences" as a result. *TransUnion*, 594 U.S. at 441–42.

The Secretary argues that PILF has not suffered an informational injury because the information it requested is not subject to public disclosure. (Doc. 12 at 6; Doc. 17 at 2–3.) Keeping in mind that the Court must assume PILF's success on the merits when analyzing standing, the Court disagrees. If Minnesota's exemption is unconstitutional, it is subject to the NVRA. So assuming PILF's success on the merits, the information PILF seeks is subject to public disclosure. *Pub. Int. L. Found. v. Wolfe*, No. 3:24-cv-285, 2024 WL 4891940, at *4 (W.D. Wis. Nov. 26, 2024).

The Secretary also argues that PILF has not pleaded downstream consequences with enough detail. (Doc. 12 at 6–7; Doc. 17 at 3.) In its complaint, PILF explains that it uses public records to educate the public, election officials, and members of Congress about the state of voter rolls, the effectiveness of federal voting laws, and state officials' compliance with voting laws. (Doc.1 ¶¶ 140–42.) And it alleges that its "ability to perform these functions is impaired because Secretary Simon is refusing to produce the requested records." (*Id.* ¶ 143.) The Supreme Court has found similar allegations sufficient. *See Pub. Citizen v. DOJ*, 491 U.S. 440, 449 (1989) (appellants sought access to public records to "monitor [the] workings" of the American Bar Association's Standing Committee on the Federal Judiciary and "participate more effectively in the judicial selection process"); *FEC v. Akins*, 524 U.S. 11, 21 (1998) (appellants sought lists of donors to the American Israel Public Affairs Committee that would "help them (and others to whom they would communicate [the information]) to evaluate candidates for public office").

Moving to redressability, the Secretary argues that the Court cannot provide the remedy PILF seeks—a declaration that Section 4(b) is unconstitutional and Minnesota is therefore subject to the NVRA. According to the Secretary, this would extend the NVRA "further than Congress intended" by "read[ing] in an action that Congress elected *not* to take." (Doc. 23 at 4.) Although this a closer question, for the purpose of analyzing standing only, the Court disagrees.

In *Ohio v. EPA*, the United States Court of Appeals for the District of Columbia Circuit held that a similar "leveling down" remedy was available and sufficient to support standing. 98 F.4th 288, 306–08 (D.C. Cir. 2024) (per curiam), *cert. denied*, No. 24-13, 2024 WL 5112340 (U.S. Dec. 16, 2024). Several states sued to block a federal regulatory provision that waived preemption of two California vehicle emissions regulations. *Id.* at 294–99. The states argued that California's exemption violated the equal state sovereignty principle, but the EPA argued that the states lacked standing because they sought to reduce California's sovereign authority, not increase their own. *Id.* at 307. The court rejected the EPA's argument. Applying a principle developed in Fourteenth Amendment Equal Protection Clause cases, it held that "when the 'right invoked is that to equal treatment,' the appropriate remedy is a mandate of equal treatment"—"a result that can be accomplished by withdrawal of benefits from the favored class" (known as "leveling down") or "extension of benefits to the excluded class" (known as "leveling up"). *Id.* (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)). Leveling down would redress the "claimed constitutional injury by leaving all states equally positioned, in that none could regulate vehicle emissions." *Id.* at 308; *accord Nat'l Coll. Athletic Ass'n (NCAA) v.*

*Governor of N.J.*, 730 F.3d 208, 239 (3d Cir. 2013) (suggesting that New Jersey could ask the court to invalidate a statutory exemption for Nevada rather than strike down the entire federal ban on state-licensed sports gambling), *abrogated on other grounds by N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453 (2018).

The Secretary distinguishes *Ohio* on the ground that "Congress did not *grant* greater authority to Minnesota by exempting it from the NVRA" but instead "chose *not to regulate* Minnesota or other states that met the qualification for exemption." (Doc. 23 at 4–5.) This is a closer question. However, in *Ohio*, the federal government likewise did not "grant" new authority to California. Rather, it exempted California from federal preemption. True, the court said that leveling down would restore sovereign equality by "removing California's greater authority." 98 F.4th at 307; *see also id.* ("The States instead seek to reduce California's authority."). But that was not to say that the federal government had granted California special power. It was to say that California lost less of its power than its peers because the federal government put a lesser burden on its sovereignty.

As in *Ohio*, a leveling down remedy would redress the claimed constitutional injury here by leaving the states on even ground. Invalidating an exemption from federal regulation is an unusual remedy, indeed. Nonetheless, relying on this authority, the Court finds that, for standing purposes, PILF's injury is redressable.

Finally, both the Secretary and the United States—intervening to defend Section 4(b)(2)'s constitutionality—argue that PILF lacks "third party standing" to assert the rights of states. (*See, e.g.*, Doc. 17 at 6; Doc. 32 at 9.) Although PILF likely does lack prudential standing, the issue is not jurisdictional. *See Kowalski v. Tesmer*, 543 U.S. 125,

129–30 (2004); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014). Since PILF's claim fails on the merits anyway, the Court need not address it. *Wolfe*, 2024 WL 4891940, at *5 (citing *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 689 (7th Cir. 2015)).[1]

Therefore, the Court finds that PILF has Article III standing and now turns to the merits.

**B. Merits**

PILF rests its constitutional challenge on the equal sovereignty principle articulated in *Shelby County v. Holder*, 570 U.S. 529 (2013), and the congruence and proportionality principle set forth in *City of Boerne v. Flores*, 521 U.S. 507 (1997). (Doc. 1 ¶ 1.) Since neither principle applies to the NVRA, PILF's claim fails.

**1. Equal Sovereignty**

In *Shelby County*, the Court heard a challenge to part of the Voting Rights Act of 1965 (VRA). 570 U.S. at 535. Section 5 "required States to obtain federal permission before enacting any law related to voting," and Section 4 "applied that requirement only to some States." *Id.* After describing Section 5's policy as "a drastic departure from basic principles of federalism," and Section 4's policy as "an equally dramatic departure from the principle that all States enjoy equal sovereignty," the Court held Section 4 unconstitutional. *Id.* It explained:

> The Fifteenth Amendment commands that the right to vote shall not be denied or abridged on account of race or color, and

[1] Furthermore, because PILF's claim fails on the merits, the Court need not address the Secretary's argument that organizations lack a private right of action under the NVRA. (*See* Doc. 12 at 7.)

> it gives Congress the power to enforce that command. The Amendment is not designed to punish for the past; its purpose is to ensure a better future. To serve that purpose, Congress—if it is to divide the States—must identify those jurisdictions to be singled out on a basis that makes sense light of current conditions. It cannot rely simply on the past.

*Id.* at 553. Under this principle, Section 4 could not stand. Its "current burdens" were not "justified by 'current needs,'" and its "disparate geographic coverage" was not "sufficiently related to the problem that it targets." *Id.* at 550–51 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). Though its coverage formula was constitutional when first enacted in 1965, *see id.* at 550 (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966)), it was unconstitutional when reauthorized in 2006 because Congress used the same formula "based on 40–year–old facts having no logical relation to the present day," instead of "us[ing] the record it compiled to shape a coverage formula grounded in current conditions," *id.* at 554.

PILF argues that NVRA Section 4(b) also uses an outdated formula. It emphasizes that many states remain subject to the NVRA despite that they now offer election-day registration. (Doc. 16 at 19–24.) But *Shelby County* does not apply to the NVRA.

The "central debate" when evaluating the constitutionality of VRA Section 4 "was the scope of Congress's power to enforce the Fifteenth Amendment 'by appropriate legislation.'" *Ohio*, 98 F.4th at 309 (quoting *Shelby Cty.*, 570 U.S. at 536 (quoting U.S. Const. amend. XV)). The Court "did not pronounce on how or whether [the equal sovereignty principle] might apply to different exercises of legislative authority under the Fourteenth and Fifteenth Amendments, much less announce a test applicable to" other

constitutional provisions. *United States v. Diggins*, 36 F.4th 302, 315–16 (1st Cir.), *cert. denied,* 143 S. Ct. 383 (2022); *accord United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018) (joining other circuits in holding that "neither *Shelby County* nor *Flores* addressed Congress's power to legislate under the Thirteenth Amendment"). And it "repeatedly emphasized that the VRA marked an 'extraordinary' departure from basic principles of federalism because it intruded into a realm (regulation of state and local elections) that has traditionally been the exclusive province of the states." *Mayhew v. Burwell*, 772 F.3d 80, 95 (1st Cir. 2014); *accord NCAA*, 730 F.3d at 239 ("[T]here is nothing in *Shelby County* to indicate that the equal sovereignty principle is meant to apply with the same force outside the context of 'sensitive areas of state and local policymaking.'" (quoting *Shelby Cty.*, 570 U.S. at 545)).

The NVRA is different. It regulates only *federal* elections. *Young v. Fordice*, 520 U.S. 273, 275 (1997); *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1198 (10th Cir. 2014), *cert. denied*, 576 U.S. 1055 (2015). So it does not intrude on a realm traditionally reserved for the states, and it need not rely on the Fourteenth or Fifteenth Amendments for authorization. *See Oregon v. Mitchell*, 400 U.S. 112, 134–35 (1970); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 803–04 (1995). Instead, it falls squarely within the Elections Clause of Article I. *See* U.S. Const. art. I, § 4, cl. 1 (authorizing federal regulation of elections "for Senators and Representatives"); *Inter Tribal*, 570 U.S. at 7–9 (discussing the Elections Clause as the constitutional provision relevant to the NVRA); *Foster v. Love*, 522 U.S. 67, 69 (1997) (same).

Unlike its Fifteenth Amendment enforcement power, Congress's Elections Clause power is not limited to "appropriate legislation." *See Ohio*, 98 F.4th at 309; U.S. Const. art. I, § 8, cl. 18 (authorizing Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its Article I powers). Rather, it is "paramount, and may be exercised at any time, and to any extent which [Congress] deems expedient." *Inter Tribal*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1879)). Indeed, "it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States," *Foster*, 522 U.S. at 69, 71 (quoting *Term Limits*, 514 U.S. at 832–33), and that the NVRA is a valid exercise of that power, *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791 (7th Cir. 1995); *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995); *ACORN v. Miller*, 129 F.3d 833 (6th Cir. 1997).

While it is less settled that Congress may establish *non*uniform rules under the Elections Clause, "neither the Supreme Court nor any other court has ever applied [the equal sovereignty] principle as a limit on" Congress's Article I powers. *Ohio*, 98 F.4th at 308. This comes as no surprise because where the Framers thought Congress should treat states equally, they said so. *Id.* at 312. Unlike some of its Article I counterparts, the Elections Clause does not require uniformity.[2] Quite the opposite—it was designed as "the Framers' insurance against the possibility that a State would refuse to provide for the

[2] *Compare* U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."), *with id.*, § 8, cls. 1 & 4 (stating that laws about duties, naturalization, and bankruptcies shall be "uniform"); *id.*, § 9, cl. 6 (stating that "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another").

election of representatives to the Federal Congress," *Inter Tribal*, 570 U.S. at 8, so it granted Congress the power to "make or alter" state regulations of federal elections, *see Smiley v. Holm*, 285 U.S. 355, 366–67 (1932) (quoting U.S. Const. art. I, § 4, cl. 1).

The Court therefore finds that Congress's Elections Clause powers are not limited by the equal sovereignty principle. In doing so, the Court joins a host of courts that have rejected equal sovereignty challenges to Article I legislation. *See Wolfe*, 2024 WL 4891940, at *8 (Elections Clause); *Ohio*, 98 F.4th at 314 (Commerce Clause); *NCAA*, 730 F.3d at 238–39 (Commerce Clause); *Mayhew*, 772 F.3d at 95 (Spending Clause).

**2. Congruence and Proportionality**

PILF also argues that NVRA Section 4(b) violates *City of Boerne v. Flores,* 521 U.S. 507 (1997). There, the Supreme Court held that when Congress passes Fourteenth Amendment enforcement legislation, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520. As already discussed, the NVRA is Article I legislation. But PILF argues that the NVRA is nonetheless subject to the Fourteenth Amendment's limits because it was designed in part to reduce discriminatory registration laws. (Doc. 16 at 27–28.)

This argument is unpersuasive. PILF identifies no authority for the premise that when a statute relates to multiple provisions of the Constitution, it must be authorized by all of them. (*See id.*; Doc. 35 at 22.) And all authority points the other way. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 561 (2012) (holding that the Affordable Care Act's individual mandate "cannot be sustained" under the "commerce power" but "may be upheld as within Congress's enumerated power to 'lay and collect Taxes'"

(quoting U.S. Const. art. I, § 8, cl. 1)); *Wolfe*, 2024 WL 4891940, at *10 ("[A] statute does not need to be supported by more than one congressional power.").

It is also hard to see how an *exemption* from a statute's coverage could be disproportionate to the injury Congress intended to prevent or remedy. If anything, Section 4(b) makes the NVRA more congruent and proportional to its goals by refraining from regulating states that adopted their own way to meet those goals by the deadline. *See Wolfe*, 2024 WL 4891940, at *6 ("Providing a state with an exemption to an otherwise generally applicable rule does not intrude on that state's sovereignty, so there is no federalism concern.").

Section 4(b)(2) of the NVRA is constitutional, so PILF's claim fails as a matter of law.

## III. Order

Based upon the foregoing, and all the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Dismiss [Doc. 10] is **GRANTED**; and
2. The Complaint [Doc. 1] is **DISMISSED WITH PREJUDICE**.

**LET THE JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: March 17, 2025

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge